## ROSE CLARK v. MARGARET McATEE and RUFUS McATEE, her husband, Appellants.

### Division One, March 31, 1910.

1. **SURVEYS: Evidence: Not Made According to Statute.** If surveys made by a surveyor in re-establishing the corners to lots are not made in compliance with the provisions of the statute (Sec. 10,188, R. S. 1899) they are not admissible in evidence as official surveys. The statute is the only authority for admitting such surveys in evidence, and to be admissible as official records the statutory directions for making them must be obeyed.

2. —————: —————: —————: **Unofficial: Correct Nevertheless.** An official survey is prima-facie correct, and no evidence is needed to establish its prima-facie character. But in order to be held official it must be made as the statute directs; and where it is shown that it was not so made, it cannot be admitted in evidence as an official record. And if so admitted the error is not cured by a showing that it was in fact correct, for it cannot be admitted on both theories.

3. —————: —————: —————: **Re-establishing Corner.** Where the rock marking a corner has been moved, the surveyor cannot take it as his starting point without re-establishing it in accordance

with the requirements of Sec. 10207, R. S. 1899. And in re-establishing it he must start at some legally established line or corner. Unless that is done, a survey made by him is not admissible as an official record.

4. EJECTMENT: No Paper Title Shown: Waiver. Where plaintiff in ejectment was permitted to testify, without objection, that she owned certain lots and that defendants owned certain others, in the same block, and no question of the ownership was raised at the trial, but the rights of the parties to a certain narrow strip is dependent upon the location of the boundary line, plaintiff's failure to show a legal paper title should be held to have been waived.

5. REMARKS OF COUNSEL: Concerning Official Survey. If the survey was properly admissible in evidence as an official record or survey, it is not improper for counsel, in his argument to the jury, to designate it as such; but if it was not an official survey, all remarks of the kind, as well as the survey itself, should be excluded.

6. EJECTMENT: Testimony: Amount of Ground in Possession of Each. Where the testimony shows that all of the ten lots in the block were of the same size, and that plaintiff, who sues in ejectment for a re-establishment of the boundary line, claiming a strip four feet wide along two of them, is the owner of half of them, and defendants of the other half, testimony offered by defendants going to show that plaintiff is in possession of one-half of the block, and defendants of the other half, no more and no less, is competent and should not be excluded, there being no question of adverse possession in the case. It should not be excluded on the theory that an unofficial survey could not be impeached by such testimony.

7. INSTRUCTIONS: To Find From Competent Evidence. The instruction read: "And if the jury find from the greater weight of all the competent evidence in the cause that said allegations of plaintiff are correct, then their verdict must be for the plaintiff." Held, that the jury has no right to decide upon the competency of the testimony admitted by the court; and the use of the word "competent" was error.

8. ——: Original Survey of Town. Where both parties purchased their lots as established by the original survey and plat of the town, the instructions should not permit either side in ejectment to recover on the theory that such survey and plat were incorrect.

Appeal from Knox Circuit Court.—*Hon. Charles D. Stewart*, Judge.

REVERSED AND REMANDED.

*F. H. McCullough, C. R. Fowler* and *P. K. Gibbons* for appellants.

The court should have peremptorily instructed the jury to return a verdict for the defendants. Section 10188, R. S. 1899, provides that in surveying town lots the surveyor shall give the distances to the points or lines from which he established the lines of the lots, and shall perpetuate the same by measuring the distances to houses standing in the immediate vicinity, or by prolonging the lines to the curbstone and cutting notches therein. This the surveyor entirely failed to do, hence the survey was a nullity and there was no evidence of probative force or of proper and legal character upon which a verdict for the plaintiff could be based. Further, no attempt was made by the surveyor to establish the destroyed section corner, being said southwest corner of section 18, township 62, range 11, which was and is the southwest corner of original Edina. But, in making the survey upon which plaintiff relies to establish her contention, he started at a lost nigger-head rock which had within recent years been dug up out of one of the principal streets in the city and by the street commissioner placed in the position where the surveyor found it and used it as a cornerstone, from which point the surveys introduced in evidence by plaintiff were all made. That was sufficient to warrant the trial court in giving the jury a peremptory instruction to find for the defendant. Decayed or destroyed corners can only be re-established by the method pointed out in defendants' instruction 3. R. S. 1899, secs. 10206 and 10207.

*O. D. Jones* and *J. C. Dorian* for respondent.

The court properly submitted the testimony of the surveyor and his survey to the jury; whether the

survey was legally made and recorded or not, or even made by a private surveyor, he might be called and testify and use his notes or survey on the subject of the location of corners, etc.   Hopper v. Hickman, 145 Mo. 411; Johnson v. Boonville, 85 Mo. App. 199.   Surveys are merely evidence of location and boundary; they decide nothing as to the validity or the superiority of the title.   The area embraced within the interference of surveys will go with the better title.   Gibson v. Chouteau, 39 Mo. 537.

WOODSON, J.—This is a suit in ejectment for the recovery of eight feet of ground off of the entire south side of lot four, and ten feet off of the entire south side of lot eight, in block four, in the original town, now city, of Edina, Knox county, Missouri.   A trial was had in the circuit court of Knox county, which resulted in a judgment for the plaintiff; and, after moving unsuccessfully for a new trial and in arrest of judgment, defendants duly appealed the cause to this court.

The petition, in substance, stated that on July 7, 1904 and at all times thereafter, plaintiff was the owner of and entitled to the possession of said tracts of ground; that the defendants afterwards, on said July 7, 1904, entered into the possession thereof, to the plaintiff's damage, in the sum of $10.   The petition alleges that the value of the monthly rents and profits of said lands is one dollar per month, prays judgment for the possession of said premises, ten dollars damages for the unlawful withholding of same, and one dollar for monthly rents and profits from the rendition of judgment.

Defendants' answer denies that they were in possession of the premises described in the petition at the date of the commencement of the suit; denies that they withhold the possession of said premises or any part thereof from plaintiff, and make general denial of the allegations of the petition.

Rose Clark, the plaintiff, without objection, testified, in substance, that she was the owner of lots four, five, eight, nine and ten in block four, in the original town of Edina, and had owned and been in possession of them for two years; and that Margaret McAtee, one of the defendants, owned the remaining lots contained in that block, namely, one, two, three, six and seven.

All of the lots are of uniform size, each having a frontage of fifty-two feet and four-fifths with a depth of one hundred and twenty-nine feet and one inch. Plaintiff's lots constituted, speaking generally, the north half of the block, and defendants' the south half. Defendants wished to rebuild a partition fence between their lots and those of the plaintiff; and, in the discussion of that matter, a controversy arose as to the boundary line between them. The result was each party had the county surveyor of the county to survey their respective lots; but, there being some difference between those surveys, the court ordered the surveyor to make a third survey, known as "Survey No. 77," of which the following is a copy:

# FIELD NOTES

No. of Survey 77.
Date—June 9  906.

Survey by order of Circuit Court, Knox County, Mo.
Chainmen sworn, Samuel Callaway and Thomas Conway.

Point established   Sec. 18,  Twp. 62,  Range 11,  5th P. M.
Plat
Blocks 1, 2, 3, 4, Original Town of Edina.

MARION          STREET
4.09 ch. x 3··

| 4 | 129 x 1·· | 129 x 1·· | | 2 |
|---|---|---|---|---|
| | 52 4·5  **5** | **10**  52 4·5 | | |
| **5** | 52 4·5  **4** | **9**  52 4·5 | | |
| | 52 4·5  **3** | **4**  **8**  52 4·5 | | |
| | 52 4·5  **2** | **7**  52 4·5 | | |
| 3 | 52 4·5  **1** | **6**  52 4·5 | | 1 |

4.00 ch.

66·   SMALLWOOD   66·   STREET

North

**3**   4.00 ch.   4.00 ch.

66·   JACKSON   66·   STREET

STREET

**2**   4.12 ch.   4.03 ch.-2··

66·   CLAY   66·   STREET

FIRST

**1**   4.00 ch.   4.00 ch.

4.10 ch. x 2··        South Line—Sec. 18-62-11.

66·
★Stone
S. W. Cor.
Sec. 18-62-11.

FRONT        STREET

## DESCRIPTION OF SURVEY.

Commencing at a point on the south line of Section 18, Twp. 62, R. 11, five chains, ten links and two inches east of the south-west corner of Section 18, Twp. 62, R. 11, then north at a magnetic variation of 7° 18′ seven degrees and eighteen minutes  15.07 chains and 2 inches to south-east corner of Block 4. Commencing again at a point on south line of Section 18-62-11 thence north at Mag. Var. of 7′ 18″, 15 02 ch. to south-west corner of Block Four, thence north 4 ch. to north corner of Block Four. For distance E and W of Block 4 see plat.

## DESCRIPTION OF CORNERS.

See Plat Block 4 for numbers.

1=Lost stone 9″x″.
  South-east corner frame building.
  N.  12  E  50 links
  Honey Locust 16″ S.
  28 W 8 links.
2=Limestone 17″x8″x3″.
3=Limestone 18″x5″x½.
  Elm 4″ N. 6½ E. 34 links, south-west corner frame bldg. N. 56½ E. 98 links.
4=Lost stone 12″x″x6″.
5=Limestone 15″x8″x4″.
6=Stake) Hickory  10″
      )    N. 31.
      ) 21 ft. 6 in.
      ) N.  E.   Cor.
      )    Frame.
      ) Bldg. S. 3½.
      )· E 44 ft. 9 in
7=State Honey Locust
  16 N. 71½ E. 21 ft. 6 in.

I certify the foregoing to be a true record of Survey No. 71.
THOMAS CONWAY, County Surveyor.

The latter survey differs from both of the former ones.

After the defendants had their survey made, according to plaintiff's testimony, they constructed a fence eight feet and four inches north of the true dividing line between lots three and four, and about ten feet north of the true line between lots seven and eight. Plaintiff then had her survey made, and undertook to build a fence on the line thereby established; but defendants interfered and prevented her from doing so. She then brought this suit. The original fence stood at the same place where defendants' new fence now stands.

Thomas Conway testified on behalf of plaintiff, substantially, as follows: That he was county surveyor of Knox county. He made two surveys, establishing the dividing line between these two properties—one was made for plaintiff and one for defendants. They did not correspond as to the dividing line, but he was unable to state what the difference between them was. The court ordered him to make another survey, a copy of which accompanies this statement. The difference that existed between the first two surveys affected the line running east and west between them, as did also survey No. 77.

The plaintiff then introduced, over defendants' objection, survey No. 77, ordered made by the trial court. According to this survey defendants are in possession of those parts of plaintiff's lots described in the petition.

According to this survey, if the dividing line between plaintiff's and defendants' lots should be extended, it would pass inside of defendants' east fence at the southeast corner of lot eight about twenty feet, and would pass through their house, and place a part thereof out in the street.

There is some kind of a building on the southwest

corner of lot eight, which belongs to defendants. It has been there five or six years.

Continuing, Conway testified:

"Q. Take the northwest corner of lot eight also the northeast corner of lot three, you established a point there? A. Yes, sir. Q. Now, where did they set with reference to the east fence running north and south between McAtee and Clark? A. I can't be positive about that. Q. There is a fence there? A. Yes, sir. Q. It makes a difference there? A. Yes, sir. Q. You have testified about the distance being eight feet farther south in reference to the fence there between lots 3 and 4? A. Yes, sir; at the west side it was eight feet. Q. You didn't notice how far it is west of his fence? A. I can't be positive about that. Q. What's your best recollection? A. If I remember right that point was east of the fence. Q. Doesn't his fence run just east of his barn? A. I can't say. Q. There is no alley through that block? A. No, sir. Q. You have set one corner near McAtee's barn? A. Yes, sir. Q. Now doesn't that barn set in line with the alley to the south? A. I can't remember about the barn. I can't answer. Q. You did establish the east line of lot 3 between these parties? A. Yes, sir; I put one corner. Q. You didn't notice whether it changed the fence there now or not? A. I can't be positive about that. There is some difference, of course. Q. How much difference is there? A. I can't say, maybe 12 feet. I haven't made any accurate measurements of the fences. Q. Where did you locate the point at the southwest corner of lot 4? A. At the southwest corner of lot 4. Q. I mean with reference to the fence between McAtee and Clark, how much difference in it, how much west of the street, if any? A. Close to the fence.

"Recross-examination by Mr. Gibbons:

"Q. What is the difference between the Robinson survey and the survey of the original town in the mat-

ter of north and south distances? A. There is some difference, a few links and inches added, some differ- ence. Q. I believe you said before in this case you followed the original plat? A. Yes, sir, for distances for exterior boundaries. Q. The plat filed for record gives the distances and width of the streets, blocks, etc.? A. Yes, sir; no surveyor's name appears to it. Q. What does it give the dimensions of block 1, 2, 3 and 4? A. Well, blocks are all 264 feet square. Q. What are the streets between them? A. All streets except Main street sixty-six feet wide; Main street 80 feet; all alleys 12 feet wide. Q. According to that Marion street north of this block 4 in question was sixty feet wide? A. Yes, sir. Q. What does it say about magnetic variations? A. Streets bear north and south, and east and west. Magnetic variation of 8.45. Q. 8.45 mag- netic variation? A. Yes, sir. Q. Did you follow this plat in making the first survey for Miss Clark? A. Yes, sir, as to distances. Q. What magnetic varia- tion in this second survey for Miss Clark? A. In this I made the variation, used the same magnetic variation as in survey No. 56, 7.30 north and south, and 6.20 east and west. Q. Don't the original plat call for the same variation in both at right angles to each other? A. Yes, sir, seems to be 8.45. Q. Refer to the Robinson survey. Please read that for the benefit of the jury? A. You want it all?

"By the Court: Yes, let's try and get along a lit- tle faster.

"Robinson survey read to the jury as follows: The original town is located on the southwest quarter of section No. 18, township 62, range 11 west. The sur- vey commenced at the southwest corner of section 18, marked A., or Coll's Corner. Magnetic variations of section line between section 18 and 19, 8° 05'. Do. from B. to C, 9° 00'. Do. of all the streets north and south, 8° 52½. Do. east and west, 9° 00'. Block No. 1 is 4 chains, 10 links, 2 inches on the north and south boun-

daries, and 4 chains and 4 links on the east, and 4 chains on the west. Block No. 2 is 4 chains, 10 links, 2 inches on the north and south, and 4 chains, 3 links, 2 inches on the east, and 4 chains, 2 links on the west. Block No. 3 is 4 chains, 10 links, 2 inches on the north and south, and 4 chains on the east and west. Block No. 5 is 4 chains, 8 links on the north and south, and 4 chains, 9 links on the east, and 4 chains and 12 links on the west. Block No. 6 is 4 chains 8 links on the north and south, and 4 chains 6½ links on the east, and 4 chains and 3 links on the west.

"Q. Now that will be enough unless they want all the blocks. What does it say about the width of the streets? A. The streets are all 66 feet wide except Main which is 80 feet wide and Marion which is 55 feet at the west end and 43 feet at the east end. The alleys are all 12 feet wide. The lots are one-fifth of the respective blocks in width north and south, and six feet less than one-half the width of the respective blocks east and west. The alleys run north and south and divide the blocks equally. Block No. 9 has no alley. Q. You found the variation of the north and south lines and the north and south blocks in the original Edina survey? A. Yes, sir, there is one place says 9. Q. How many links on the east side of the blocks? How much variation or difference between the two? A. None in block 4. Q. You must have started then to establish block 4 on the east side of block 1? A. 4 chains, 4 links on the east and 4 chains on the west. Block 2 is 4 chains, 10 links and 2 inches north and south and 4 chains 3 links, 2 inches east, and 3 chains, 2 links west. No. 3, on the east. No. 3, 4 chains, 10 links and 2 inches on the north and south and 4 chains east and west. Q. You found there were seven links and two inches given on the east from the original plat? A. Yes, sir. Q. Tell the jury how many feet? A. Five and a half. Q. Then there is a difference of five

and a half feet? A. Yes, sir. Q. If you followed the variation of the original plat of the original survey, would it not make a difference of five and a half feet in the location of the southeast corner of block 4, McAtee's corner? A. Yes, sir; of course it would. Q. You testified a while ago that the surveys were substantially the same? A. About the same. Q. Read that again as to the streets please? A. Streets are to be 66 feet wide except Main street which is 80 feet and Marion which is 55 feet at the west and 43 feet at the east end. Q. Tell the jury where Marion street is located with reference to the propety in question? A. Just north, north of Miss Clark's land. Q. And in the original survey was to be how wide? A. 55 feet. Q. In the original plat how wide was it to be? A. 66 feet wide. Q. That's a difference of how many feet? A. 11 feet. Q. There is quite a substantial difference there? A. Yes, sir. Been a good deal added to these blocks. Q. Still you think you come to about the same result as when you followed that plat? A. About the same. Q. Didn't you follow the original plat when you made surveys 56 and 57? A. Yes, sir. Q. Didn't you follow the original plat when you made the last one? A. Yes, sir; I had to add to the length of each block. Q. Do you wish the jury to understand that the surveys are the same, substantially the same? A. I wish the jury to understand that survey 77 was made to correspond with the original Edina survey. Q. Didn't you just figure out the difference from the original plat some five and a half feet? A. On the east side, yes. Q. In making this first survey, didn't you follow the plat? A. Yes, sir. Q. Don't you think that survey must have varied five and a half feet in the southeast corner of the block? A. I never ascertained. Q. From your calculation, the variation would be that much? A. Yes, sir. Q. Where did you start when you made this last survey? A. Southwest corner section 18. Q. From what? A.

Lost stone, boulder. Q. Is that stone of record in the surveyor's records of the county? A. No, sir. Q. What kind of rock is it? A. Granite boulder. Q. Commonly known as a nigger-head? A. A granite boulder. Q. Nigger head? A. Yes, sir. Q. Where is it there? A. A little west of the sidewalk. I think Fred Parsons lives there now. Q. Is there any fence there? A. No, sir. Q. Did you ever know there was a fence running west or north? A. One run from the north. Q. How far is it from the walk in front of Parsons' house looking west along that street? A. I can't state exactly, I guess three or four feet. Q. This matter of variation, when you run any line in the county in surveying to what book do you first refer? A. Original field notes. Q. Turn to section 18, township 62, range 11, now what mark do you find at the southwest corner of 18, southwest corner of the original town of Edina? A. Two white oaks. Q. Any nigger-head referred to there? A. No, sir. Q. At what time was this survey made? A. 1834. Q. What was the magnetic variation of north and south line at that time? A. He gives it 9.15, has been in land office since the county come into possession of the original field notes. Q. When you made all these surveys you followed this book? A. Yes, sir. Q. Explain to the jury what this magnetic variation means? A. Turning from the true meridian. Q. You can't follow the needle? A. No, sir. Q. You have a rule that you follow in determining the magnetic variation from year to year? A. Yes, sir; use a rule. Q. How do they determine the true line at any time? A. The North Star. Q. That's always the same? A. (No answer). Q. The magnetic variation in 1834 was 9.15? A. Yes, sir. Q. What does the rule give it for the nearest point? A. Two and three-tenths minutes annual change. Q. This means two and three-tenths from the variation each year? A. Yes, sir. Q. What point is nearest Edina? A. St. Louis, taking that

original Edina survey. Q. Calculating until the time of this survey in 1859, how do you find this magnetic variation, do you find it to be correct or did he use the proper magnetic variation? A. Taking his given notes, he did. Q. Well, you have figured the magnetic variations, haven't you? A. I have figured it on a basis of 10-6-30. Q. How does that correspond with the established lines run at that time? A. Heavier. Q. Which do you think right? A. 10-6-30. Q. You think the other a mistake? A. Yes, sir, by common practice. Q. Well, taking that, what do you figure the variation to-day? A. 7-20-50. Q. What other authority have you as to magnetic variation? A. Geographical survey in the park. Q. Have you observed that? A. Yes, sir. Q. What do you find it to be? A. 6:20. Q. Your calculation from that makes it 7:20:50, and the other makes it 6:20? A. Yes, sir. Q. Which one do you consider best? A. One in the park. Q. You consider the one in the park best? A. Yes, sir, because these men are competent men. Q. Employed by whom? A. United States Government. Q. And then there is a contradiction in the record furnished Knox county as original field notes? A. Seems to be. Q. Is the variation a very material item in making a survey. A. Yes, sir, certainly in line bearings it is material. Q. Is the variation a very material item in making survey of block 4? A. Well, of course to some extent. Q. What effect would it have if you had gotten the proper starting point and measured east as you did in surveying No. 77 if you took the wrong variation for that line, we will say you run south one degree too much? A. Of course it would make a difference, the longer the line the more difference it would make. Q. If you took the wrong variation from the proper starting point, would the lines established be wrong? A. Yes, sir. Q. I believe you said in your direct testimony your survey took off about 12 feet from Mr. McAtee on the east?

A.  I think 20 feet.  And the line south of her fence 12 feet.  Q.  About how much of the west side between lots 3 and 4?  A.  Somewhere around 8 feet.  Q.  You had 8 on one end and 12 on the other, 8 on the west and 12 on the east, now didn't it depend on whether you get the proper magnetic variation?  A.  No, sir, simply because my measurements were based on the section line.  Q.  How did you know you were on the section line?  A.  I run it several times.  Q.  Did you establish that section line, did you put a peg, or how did you mark it?  A.  Drove a nail.  Q.  How long ago did you drive it?  A.  Day of making survey.  Q. How did you know that, when you were on the line? A.  Run the line.  Q.  You didn't run the section line that day?  A.  Yes, sir.  Q.  How far?  A.  John Klote's corner.  Q.  What mark did you find at Klote's corner?  A.  Piece of iron.  Q.  What survey were you making when you drove that?  A.  Jerry Kehoe.  Q. What were you doing?  A.  Trying to ascertain the section line between section 18 and 19.  Q.  Were you making a survey to determine line between Jerry Kehoe and the Reed heirs?  A.  Yes, sir.  Q.  Is there a difference between the original Edina survey and the original plat right there at that corner?  A.  Twelve feet at the southeast corner.  Q.  You were then trying to find this corner when you drove this peg in the street?  A.  Yes, sir.  Q.  Which were you following, the original plat or the original survey?  A.  I was attempting to follow the original plat locating the section line.  Q.  Didn't you follow the original plat when you started north to make this last survey?  A.  No, sir.  Q.  Why didn't you?  A.  On account of this part added.  Q.  You know that you started on the section line to make this last survey from Mrs. McAtee? A.  Yes, sir.  Believing these plats as a matter of record I come to the conclusion that section line is the south line of the original town, original town of Edina. Q.  You testified that you were following it that time,

the original plat laid out right on the section line between 18 and 19. A. Yes, sir. Q. You were following it when you drove this peg? A. Yes, sir. Q. Finally it developed that the original Edina survey differed from that 12 feet? A. Differs at the southeast as I understand it. Q. You were following the original plat when you were running that line in which you drove that stake there? A. Yes, sir. Q. When you set it there, this nail you drove the second, were you on the same line that you established following the original survey? A. Yes, sir. Q. Now at what variation did you run that line? A. 5:30. Q. Have you ever had occasion to make a measurement of the distance from the section line to the southwest corner of the Northern Addition? A. Yes, sir. From the range line west I made a measurement. I have forgotten what it is. Q. Did you ever make a calculation as to the distance along the range line as made by the original Edina survey? A. No, sir; I don't think I did. Q. What is the distance from A to Coll's corner north of the northern line of Marion street along the range line? A. 1375 feet. Q. How wide did you count Marion street? A. Fifty-four feet. Q. Tell the jury what you found that distance by the original Edina survey? A. 1309 feet. Q. What does your survey show it, Tom? A. Shows the same thing. Q. Shows 1309 feet? A. Yes, sir. Q. Well, now Tom, turn to the Northern Addition there, tell the jury the distance there at the east, how does it correspond with the other? A. 1324 feet. Q. Well, then, what difference do you find between them? A. Fifteen feet. Q. That corresponds with the distance we just calculated north? A. Yes, sir. Q. And the difference you find to be 15 feet? A. Yes, that's right. Q. Well, what would your inference be as to the cause of that starting from the same point and going over the same ground and varying fifteen feet, how do you ac-

count for that? A. Might be a mistake in measurement. Q. If you would run that distance taking the wrong variation, would that account for it? A. Yes, sir. Q. There is a difference of fifteen feet? A. Yes sir.

"Redirect examination:

"Q. Did you make that mistake? A. I had nothing to do with it. Q. You don't think you made that mistake? A. No, sir. Q. I will ask you if in your opinion this last survey that you made, you used the proper variation and properly divided the block between these parties? A. Yes, sir; I have made calculations on the variation and as given in the original field notes is 10-6-30, and then taking into consideration the time that has elapsed and figuring it by the table given by the authorities, I think it is right. I done the very best I could do. Q. I will ask you if it isn't a fact that that street on the south side of Mrs. McAtee's property and in front of her property is 75 or 80 feet wide, her street is? A. I can't be positive. It's over 66 feet. Q. It's a way over 66 feet? A. Yes, sir. Q. If you would go down 12 feet farther south into what kind of ground would you get? A. The southwest corner of block 4 is marshy. The southeast is very nice ground. Q. I will ask you if according to your survey a part of her property is in the street south of there? A. Yes, sir; that's where we located it. Q. Before you leave the stand, what book is that you have in your hand? A. Town plat book. Q. Please turn to the plat of the original town of Edina."

Said plat admitted, but is not set out here because not material to any issue involved.

By Mr. Jones: "Please read also the references or description found on page 3 of said plat book."

Said description or reference being in words and figures as follows:

References:

1. Main street 80 feet wide.

2. All streets except Main street 66 feet wide.

3. All alleys 12 feet wide.

4. The blocks are all each 264 feet square.

5. The lots are each 126 feet in length.

6. The streets are laid out at right angles and bear north and south, east and west; and are surveyed at a magnetic variation of 8 ° 45 '.

7. The town is laid out upon the W 1/2 of the S. W. qr. 18, T. 62, R. 11.

8. Block numbered 9 declared public property for the purpose of containing the courthouse, should the town be selected for a county seat.

9. All lots not otherwise declared are each— feet 9 3-5 inches front by 126 feet length.

10. The alleys run north and south in the middle of the block.

11. Block No. 9 has no alley.

Miss Rose Clark recalled:

"Q. I will ask you if you know where the fences were, dividing lots three and four and between lots seven and eight the time of these surveys that have been referred to? A. Just where they are now. Q. This house that has been referred to, testified to as being on this line, called a barn, when was that built there, since these surveys? A. Yes, sir. Q. Since all of these surveys that barn was put there? A. All except the court survey. Old chicken house was moved after the surveys was made on the line. Q. Do you know where the fence is on the east end of lot 3, what sort of a fence it is? A. Two wires, I think. Q. How long since it has been put there? A. Since year ago last August. Q. Before any of these surveys? A. No, sir. Q. How far east is the peg Tom drove of your fence? A. I don't know exactly. Q. To the best of your knowledge and memory? A. I don't

know. Q. I believe you said that to the best of your knowledge these lines between 7 and 8 were moved south about 12 feet by Mr. Conway? A. I didn't say how far. Q. You don't know how far these lines surveyed moved the line along the east end of lot 3? A. The same line it went every time."

This was all of plaintiff's evidence. To which defendants offered a demurrer, which was overruled, and they excepted.

Defendants to sustain the issues on their part introduced evidence as follows:

Dan McCann, sworn on the part of defendants, testified substantially as follows: That he resides about three miles west of Edina. Had Mr. Conway survey a line between him and Hunolt, near McCann's bridge. He established a corner there; lived there forty-three years. He knew where the Government corner was; saw Mr. Smallwood locate it there. It was right in the stream. Conway changed this corner about twenty-five or thirty feet from where Smallwood placed it. Witness was a chain carrier when that was done. The corner was established in the creek about thirty years ago. Conway started west of the one in the creek. From there he ran one line north. He was right there when Conway came out, but did not see him establish the corner. It was a rock set in the ground. Conway never told him that he placed the rock there, but Honolt told him that he did.

George Shadle testified: That he had resided in Edina all his life. Assisted in opening the street between the properties of Fred Parsons and Mr. Fisher. We plowed up the nigger-head rock that now stands at the foot of a locust tree in Mr. Parsons' yard. We loaded it in a scraper and hauled it up to Shumate yard. We were hauling dirt out of the street to that

yard.  We put it "right about where it is now."  I know where it now is.  It is a big round rock.  We plowed it out of the ground.  The plow struck it several times before we dug it out and took it away.  The plow made a mark on it, and that mark is still there. Uncle Sam Randolph was doing the work.  The rock is about eleven or twelve feet from the corner of the sidewalk.  George Brown, Pearl Patterson, Uncle Sam Randolph were working on that street at that time. Pearl Patterson hauled the rock up there.

Henry Krueger testified:  That he resides in Edina; and that he knew the land north of Fred Parsons' residence in section thirteen.  Henry Sandknop owns some land there.  He purchased it from Bishop. Sandknop has owned that land for twenty-five years. Part of it was planted in a vineyard, and was fenced with an old rail fence.  Witness sold to Gibbons forty acres of land there and he got Conway to survey it. He changed Sandknop's fence three feet at the east end and about twenty-seven at the west end.  The fence had been run at random.

Samuel Randolph testified:  That he resided in Edina, and that he had been street commissioner there for ten years.  Worked on the street near Fred Parsons' when it was opened.

"Q.  What do you know, if anything, with reference to a rock that now sets north of that street at the foot of a locust tree?  A.  We plowed that rock up in 1899 right out in the middle of the street there right south of the house.  The boys wanted to know what to do with it to get it out of the way.  I said haul it over and dump it in that ditch in the corner of Fred Parsons' yard.  Tom Shadle and George were working for Shumate I believe, anyway the rock was loaded in a scraper and hauled up there, out of the way.  Q. Have you been there recently?  A.  Yes, sir; several times.  Q.  There is no other rock of that description within a few feet of that rock?  A.  No, sir.  Q.

That's the only granite boulder, nigger head, right there? A. Yes, sir. Q. How far is that north of the walk where it intersects the crossing? A. 16 feet north. Q. How far west of where the fence should run there? A. There's no fence there. Q. Have you observed with reference to the other corner of Mr. Fisher's property? A. About on a line with that corner. Q. You say this stone is about 16 feet north of the north line of that street running west? A. Yes, sir. Q. I believe you testified about working there? A. Yes, sir.''

Cross-examination by Mr. Jones:

''Q. Who do you say hauled that rock there on the scraper? A. George Shadle. Q. Did Pearl Patterson have anything to do with it? A. He may have helped put it on the scraper. Q. Give us some of the names working there. A. Tom Shadle, Tom Fahey, George Shadle, I believe Cook had three teams there. Q. Did they tell you to move it in the yard? A. They told me to move it in the ditch at the corner near there, where it is now. Q. Moved it where it is now? A. Yes, sir. Q. How did you get it out of the ground? A. Plowed it up. Q. Have you noticed the rock recently? A. Yes, sir. Q. Did you know of any mark the plow made? A. Yes, sir.''

Mike Stablien, testified that he resided in Edina about forty years.

''Q. Are you acquainted with the location of lines in block 4, original Edina? A. I have been around there. Q. Well, did you make some measurements to see the difference between Conway survey as introduced by these parties and how the fence would angle to the east? A. I made some measurements there about a year ago. Q. Do you remember how much difference there was there? About how much would the survey cut off of the east side of block 4? A. I suppose about 20 feet. Q. How much of McAtee's house would it cut off? A. Take off the front part. Q.

Was Conway there when you sighted through? A. No, sir. Q. Did you notice whether or not McAtee's south fence is in line with each fence on the north side of that street on through there to Linville's?"

By Mr. Jones: "We object because it has no bearing on the issues presented in this case and is incompetent, irrelevant and immaterial."

By the Court: "The objection is sustained."

To the action of the court in sustaining the said objection defendant's counsel did then and there except and saves herein his exceptions.

By Mr. McCullough: "Your Honor, it seems to me this is competent evidence under the state of facts arising here as everything has been introduced, including all the surveys made of this block, and also the original plat of the town of Edina and the Robinson plat."

By the Court: "I have sustained the objection."

To the action of the court in sustaining the said objection, defendants' counsel did then and there except and saves herein his exceptions.

"Did you ever notice the lines dividing the block north and south in the center? A. Yes, sir. Q. How far is this pin set by Conway west of the line of the east end of McAtee's north lot? A. No, I don't know. Q. Where does it place the alley? A. Moved it west 12 feet I think, nearly as much as it is on the other corner of the block."

Newton Schofield, sworn on the part of the defendant, testified as follows:

"Q. What official position do you now hold in the city of Edina? A. Street commissioner. Q. Have you been down at block 4, original Edina? A. Yes, sir. Q. Have you noticed the Conway survey of that block? A. Yes, sir. Q. Which direction do the alleys run in original Edina? A. North and south. Q. How do they divide the blocks? A. Supposed to run through the center of the blocks. Q. Divide the

blocks equally? A. Yes, sir; supposed to be 126 feet
east side of the alley. Q. What change in the alley
would the Conway survey make there? A. I judge
change it 12 feet. Q. What direction would it move
it? A. West. Q. Have you noticed the character of
the ground at the southwest corner of block 4? A.
Yes, sir. Q. What kind of ground is it outside there
for eight feet? A. Sort of holler, very low. Q. What
kind of ground at the northwest corner of block 4? A.
Moderately high. Q. What about the width of Marion
street on the north of this property? A. I have never
measured it. The plat I think gives these streets each
60 feet. Q. You never measured it? A. No, sir. Q.
On the north? A. I measured that. Q. How wide is
that? A. 70 feet. Q. That's Marion street? A. Yes,
sir. Q. There at Rose Clark's corner? A. Yes, sir.
Q. Do the lines of block 4 correspond with the lines of
other blocks there as now fenced? A. Pretty close to
it now. Q. North and south and east and west? A.
Yes, sir.''

Samuel Randolph recalled for further examina-
tion: "Q. While you were street commissioner, did
you move or authorize the owners of block 3 to move
their fence south to the boundary line of Marion
street? A. Yes, sir. Q. What did you do that for?
A. Straighten the street. Q. Marion street is on the
north of the original town of Edina? A. This fence
we moved on the north side of that block. Q. Moved
it south? A. Yes, sir. Q. How wide did you leave
the street when you did that? A. 66 feet.

Rufus McAtee testified as follows: "Q. You
know Rose Clark? A. Yes, sir. Q. You are one of
the defendants in this case? A. Yes, sir. Q. You
heard Miss Clark testify? A. Yes, sir. Q. State to the
jury whether or not you had this conversation with her
in which you said that you were going to ascertain
what this line was and that you would then move your
fence? A. No, sir. Q. Did you ever have any con-

versation with her about these lands? A. Yes, sir. Q. What conversation did you have, if any? A. Before there was any surveying the fence stood where it stands now. Q. If you know was the other fence built across the east side of the block? A. I don't remember. My brother-in-law owned that 35 years ago, and in 1899 we bought it and part of the fence stands there to this day, marks of it. Q. I will ask you whether or not that fence line between lots 3 and 4 which lies north of the place where the fence now stands, whether or not you can see where the posts were? A. No, sir; there is a ridge there where I suppose the fence stood. It is four times as high there as other places. Shows where the fence line was and had been. Q. You may state to the jury whether or not you was present the time of the first survey made by Conway? A. Yes, sir; he didn't set any corners. Didn't do anything, just measured off a line of these partition fences. I don't know whether you call it a survey or not. Q. How much difference did that make in the line as the fence now stands? A. I think about three feet. I think that's right, to the best of my recollection. Q. Now, then, at that time there was no measurement made by Conway to fix the line between lots seven and eight on the east side of the block? A. No, sir. Q. Now then, were you present at the time Conway made this survey No. 57, for Miss Clark and set stakes? A. That was the survey for Miss Clark, yes, sir. Q. Where with reference to the fence between lots 7 and 8, how much difference did that make, how much further south? A. The second survey he made for Miss Clark took eight feet off of lot 3. Q. How much on the other side? A. I don't know exactly, 10 feet 2 inches. Q. From the fence as it now stands? A. Yes, sir. Q. Did it have any effect on your residence? A. Took off about fourteen feet, this line running north and south did, took off all east of the windows of my house. Q. State whether or not that survey as made by Mr.

Conway for Miss Clark moved the west line of lot 7 further west and if so, how far? A. Moved it 14 feet I think. Q. Took a part off of lot 3? A. Yes, sir. Left a strip between two alleys of about eight feet. Q. Took a strip of ground from you of 14 feet? A. Yes, sir. Q. Gave it to Miss Clark? A. Yes, sir; added it to lot 8. Q. Were you present and did you notice where Mr. Conway set his stakes? A. He put corner rocks there. Q. Did you see where he set them? A. Yes, sir. Q. With reference to this first survey, were they the same or different? A. On the west side in the first survey he took off 8 feet of lot 3, and the second survey he took 4 feet and 6 inches. Q. That makes a difference of three feet six inches? A. Yes, sir. Q. How much did he take off of the east side between lots 7 and 8? A. 12 feet the first time, I don't know for certain the last time. I guess both stones stand there yet. Q. State to this jury whether or not Mr. Conway has ever been able to make any two lines alike in surveying this block? A. No, sir; in his measuring none of the three were alike. The last survey on the west four feet and six inches on the west, and the second last one eight feet, and the first one about three feet."

Cross-examination:

"Q. You ordered the first survey did you not? A. I asked Mr. Conway to measure the line of these lots. Q. You employed him? A. Yes, sir. Q. You did have a conversation about this fence between the property? A. None about the east part. Q. At the time you remarked you thought it necessary to have the survey to establish lines, did you not? A. I don't know. Q. Didn't you tell her you thought it necessary as you were putting in a permanent fence, that you thought it necessary to establish this line? A. No, sir; I never told her anything of the sort at all. Q. You started to move your fence on the first survey? A. I had some new posts made, put down. Q. On the line made by Mr. Conway? A. I didn't tear down the old fence. Q.

You started to put in your fence? A. Yes, sir. Q. Why did you change your mind, didn't you tear out your fence? A. I didn't tear out the old fence. Q. You have erected buildings there on that line since? A. On the alley. Q. Wasn't that chicken house erected there since? A. No closer to the line than it was set.''

Redirect examination:

''Q. These fences are standing where they were when you bought the property? A. Yes, sir, the east is. Q. Were there when you bought the property? A. Yes, sir.''

Defendant rests.

Plaintiff to further sustain the issues on her part introduced the following evidence in rebuttal:

Samuel H. Moore, sworn on the part of plaintiff in rebuttal, testified as follows:. ''Q. Where do you live? A. Edina, Knox county, Missouri. Q. How long have you lived in Knox county and Edina? A. Ever since 1850. Q. I will ask you what you know of the corner stone, used to be called McGonigle corner, the south one of the two?''

By Mr. McCullough: ''We object because this rock, this south rock, is not in issue here and the evidence is incompetent, irrelevant and immaterial.''

By the Court: ''The objection is overruled.''

To the action of the court in overruling the said objection defendants' counsel did then and there except and saves herein his exceptions.

''A. The first survey I ever knew of, this was when I was quite a boy. March was called in to survey some in that neighborhood and I carried the chain, the one right under the sidewalk close there where Fisher lives. There is another rock north there—a nigger head. Q. What year was the Fisher rock you speak of? A. '52 or '53. Q. Did you see it there again? A. Yes, when Father Fitz bought this new ground for the new cemetery, went down there to that corner.''

Thomas Conway recalled in rebuttal testified as follows: "Q. Did you use the south limestone rock under the corner of the sidewalk near Fisher's in ascertaining the situation of the rock you started from in making this survey? A. I measured from that rock 111 links north to this rock I started from, distance as given by the original field notes. Q. Mr. McCann testified that you ran a line a mile west to the McCann bridge, and he claimed the old corner had been in the creek, was in the creek and you ran across to the other side, what do you say about that? A. I established a corner there near the bank of the creek. I presume channel had changed and dug off a part of the bank there. Q. The channel changed? A. Yes, sir. Q. Did that change their boundaries? A. I think so, where I established it I established another junction of their fences. Q. Did you find the old corner? A. No, sir, I found section corner."

In considering his evidence it should be borne in mind that he does not pretend to have established corners, as is required to be done by section 10207, Revised Statutes 1899.

Whereupon, at the request of the plaintiff, the court gave to the jury the following instructions:

"1. The court instructs the jury, that the witness, Thomas Conway, is the qualified and acting county surveyor of this county, and was directed by this court to survey the block 4 in question, fix its corners and divide it between the parties to this suit; that if you find and believe from the evidence in the cause that his survey No. 77 was correctly made, then it will be the duty of the jury to find accordingly and find that the plaintiff is entitled to the possession of a strip of ground —— feet wide along and in the entire south side of lot 4, in said block 4, in the original town of Edina; and also a strip of ground —— feet wide along and in the entire south side of lot 8, in said block.

"2.   The court instructs the jury that it devolves upon the defendant to show by the preponderance of the evidence that the survey No. 77, made by Thomas Conway, in obedience to an order of this court, was erroneously made, and unless the defendants have satisfied you by a preponderance of the evidence that .it was erroneous, then your verdict must be for the plaintiff.

"3.   The court instructs the jury that the plaintiff claims that she is entitled to the possession and is the owner of the land described in the petition and the defendants are now in possession thereof and refuse to deliver same to the plaintiff, and if you find from the greater weight of all the competent evidence in the cause that said allegations of plaintiff are correct, then in that event your verdict must be for the plaintiff.

"4.   The court instructs the jury that if you find for the plaintiff your verdict may be in the following form: 'We, the jury, find that the plaintiff was the owner and entitled to the possession of a strip of ground —— feet wide along and in the entire south side of lot 4, in block No. 4, original town, now city, of Edina, Missouri, at the time of bringing this suit, and also that the plaintiff was the owner of and entitled to the possession of a strip of ground —— feet wide along and in the entire south side of lot No. 8, in said block No. 4, original town, now city, of Edina, Mo., together with damages for the detention thereof.'

"5.   The court instructs the jury, as a matter of law, that there is no evidence before you on an agreed line, and a fence built on the right line by mistake and without the agreement of the parties that it is a correct line cannot establish a line no matter of how long standing, and you must not consider such fact that a fence stood on the line in absence of evidence that it was an agreed line in arriving at your verdict.

"6.   The court instructs the jury, that in this cause nine of your number may find a verdict, but in

that event all members so finding must sign the verdict, but in case you all agree then only your foreman shall sign the verdict."

Which instructions the court gave to the jury. The defendants then and there duly excepted and saved their exceptions at the time.

Thereupon, at the request of the defendants, the court gave to the jury the following instructions:

"No. 1.   The court instructs the jury, that the question in this case is not how would an accurate survey locate the lots in question, but how did the original survey locate them?  The only purpose of the evidence of the surveyor is to enable the jury to locate the original boundaries of the lots, if possible, and not for the purpose of determining where they ought to have been or where they would have been by an accurate survey.

"The original starting points and boundaries are questions of fact for the jury to find from the evidence, not only from the evidence of the surveyor but all other evidence in the case bearing upon these points, and if from all the evidence in the case the jury cannot determine the boundaries of the lots and the exact description of the land claimed by the plaintiff, then your verdict must be for the defendants.

"2.   The court instructs the jury, that if they believe from the greater weight of the evidence that the survey No. 77, made by Thomas Conway, county surveyor, is erroneous and incorrect, then they will not consider said survey as evidence in arriving at their verdict in this case.

"3.   The court instructs the jury, that destroyed or decayed section corners can only be established in the following manner:

"1st.   By re-establishing said destroyed or decayed corners at the point of intersection of the original marked section lines; if said point cannot be established in this manner, then to commence at any two section corners in transverse directions from the

corner sought and run random lines in the direction thereof to the quarter section corners; note the falling therefrom; then adjusting the compass to the true course of said lines, respectively, continue the true course of said lines, and establish the corner sought at the point of intersection thereof.

"And if the jury shall believe from the evidence that the rock in or near the Parsons' yard was not so established and is not the true section corner of section 18, then any survey starting from said point is erroneous and cannot be considered by the jury in reaching your verdict.

"4. The court instructs the jury, that if you believe from the greater weight of the evidence in the cause, County Surveyor Conway arbitrarily, and without any record of its establishment, took the rock in or near the Parsons' yard as the true corner of section 18, or 'Call's Corner,' when in truth and in fact said rock was put there without any reference to the true corner and was not the true corner, and from all the evidence in the cause the survey relied on is erroneous, then your verdict must be for the defendants."

During the closing argument of plaintiff's attorney, Dorian, the following remarks were made by said attorney:

"They talk about establishing these corners and lines; these lines were established by an order of this court."

Mr. McCullough: "If the court please, we except to the remarks of counsel."

And to the action of the court in failing to rebuke counsel for said remarks, the defendants at the time saved their exceptions.

I. The first insistence of counsel for appellants is, that the trial court erred in refusing to give the

instruction in the nature of a demurrer to the evidence, asked by them at the close of respondent's case.

There are two predicates upon which counsel base their insistence, namely: first, that the surveys made by Conway, the county surveyor, and introduced in evidence, were not made in conformity to the mandates of section 10188, Revised Statutes 1899; and, second, that no attempt was made by Conway, the surveyor, to establish the confessedly destroyed section corner, the same being the southwest corner of section 18, township 62, range 11, which was and is the southwest corner of the original town of Edina, the basic point from which said Conway made his said surveys.

In the consideration of these two propositions, it should be borne in mind that the record contains no evidence which tends to prove that appellants are in the possession of any of respondent's ground, except as shown by said surveys and the testimony of witnesses predicated upon the correctness of these surveys.

The second provision of said section 10188 reads: "Second, in surveying town lots, he shall give the distances to the points or lines from which he established the lines of the lots, and perpetuate the same by measuring the distances to houses standing in the immediate vicinity, or by prolonging the lines to the curbstones, and cut notches therein."

Counsel for appellants insist that these surveys should have been excluded, for the reason that the surveyor who made them entirely failed to comply with the above provisions of said statute. In fact, counsel for respondent do not contend that he did, but insist that the court properly admitted the surveys in evidence, and contend that it is immaterial "whether the surveys were legally made and recorded or not, or even made by a private surveyor, he might be called and testify and use his notes or surveys on the subject of the location of corners, etc."

As to the insistence of counsel for appellants, there can be no question but what the mandate of that statute must be complied with before surveys made by a county surveyor are admissible in evidence as official records. The only authority for making such surveys evidence is chapter 164, Revised Statutes 1899, of which said section 10188 is a part; and if that is a valid enactment, then its terms providing how surveys shall be made must be obeyed. If, upon the other hand, the act is invalid, of which there is no suggestion, then there is no authority whatever for admitting such surveys in evidence. Consequently, it is immaterial which horn of the dilemma we take—the admissions of those surveys in evidence as official records was error.

Counsel for respondent seek to evade the effects of that statute by insisting that said surveys were admissible in evidence for the reason that they are shown by the testimony of the surveyor to be correct.

If the court had admitted these surveys in evidence on the theory now suggested by counsel for respondent, there would be much force in that insistence, as shown by the cases of Hopper v. Hickman, 145 Mo. 411, and Johnson v. Boonville, 85 Mo. App. 199; but that was not the theory upon which the court admitted said surveys; nor did these surveys go to the jury upon the theory that they were only a part of the surveyor's testimony at the trial of the cause, and that their weight depended upon that testimony. But they were admitted upon the theory that they were official records, and went to the jury upon the theory that they were made by a disinterested officer, acting under his oath of office, and vouched for by his official bond; and not as surveys made by a private citizen and only vouched for by his testimony while upon the witness stand, given in favor of only one of the parties litigant.

The record discloses the fact that surveys 56 and 57 were not even made at the request of the circuit

court, but at the request of the parties litigant. The court ordered survey No. 77 made, as provided for by section 10184, Revised Statutes 1899, which reads: "The county surveyor shall execute all orders to him directed by any court of record, for surveying or re-surveying any tract of land, the title of which is in dispute before such court, and all orders of survey for the partition of real estate."

None of these surveys was admissible in evidence as an official or public record, except as is provided for by section 10186, which reads as follows: "No survey or resurvey, hereafter made by any person, except that of the county surveyor or his deputy, shall be considered legal evidence in any court in this State, except such surveys as are made by the authority of the United States, or by mutual consent of the parties."

None of them conforms to the requirements of section 10188, and for that reason they were inadmissible in evidence under section 10188. [Stumpe v. Kopp, 201 Mo. 412.]

Surveys 56 and 57 were also inadmissible, for the additional reason that all witnesses, including Conway, the surveyor who made them, testified that they were incorrect surveys.

But, notwithstanding those facts, the court evidently admitted these surveys as public records. This is shown by the fact that the court itself ordered survey No. 77 to be made, which could only be done under said chapter, which only has reference to that character of surveys; also by the remark of the court in excluding certain portions of the testimony of the defendant, Rufus McAtee, hereinafter set out, wherein the court said: "I don't think you can impeach a survey this way. The objection is sustained;" and by the refusal of the court as requested by counsel for appellants to reprimand counsel for respondent for using the following language during his argument be-

fore the jury, to-wit: ''They [referring to counsel for appellants] talk about establishing these corners and lines; these lines were established by an order of this court;'' and this is also conclusively shown by the action of the court in giving instruction No. 2 on behalf of respondent, wherein the jury were, in effect, told that the burden was upon appellants to show that survey No. 77, made in pursuance of an order of the court, was incorrect.

Official surveys, like other records, deeds and official acts, speak for themselves, and do not depend upon parol evidence to support them. They are made under official oath, and are presumably correct without they show upon their faces that they are incorrect, or that they were not made in pursuance to statutory requirements; but if a survey appears upon its face to be regular and correct, then it can only be impeached by showing that it is incorrect by evidence *aliunde*. If the evidence had shown that survey No. 77 was regular and correct upon its face, then instruction No. 2 would have properly declared the law to the jury.

The very purpose of this statute requiring the surveyor to ''give the distances to the points or lines from which he established the lines of the lots,'' etc., was to make them prima-facie evidence of the facts therein stated, and thereby avoid the necessity of resorting to parol evidence to show its accuracy, which otherwise would have to be done where the surveyor was absent or dead. Such a survey, in the very nature of things, would carry more weight and convincing proof with it than would a survey made by a private individual, supported only by the oath of a partisan witness, called to testify in the cause.

And as regards the second error of the court, before suggested, namely, that the surveyor made no attempt to establish the destroyed section corner, before mentioned, to-wit: the southwest corner of section 18, township 62, range 11, which was and is the south-

west corner of the original town of Edina, the same being the basic point of these surveys, is also well taken.

No one can read the evidence in this case, and we have taken much care to read and set it out in full, on that point, and reach any other conclusion than that Conway, the county surveyor, took as his base or starting point for these surveys the old igneous rock or "nigger head," which had been plowed up in one of the streets of Edina, and which had been deposited at or near where Conway found it. Nor is there a scintilla of evidence tending to show that, the southwest corner of said section 18, which had been lost, had ever been re-established by any one and marked by this igneous rock, which could only be done under the authority of said section 10207. It is true Conway testified that he ran other lines and ascertained therefrom that this rock marked the true southwest corner of section 18, yet he does not give the courses and distances to the points or lines from which he says he established the points and lines given in his surveys, as required by said section 10188; nor did he establish that lost or destroyed corner, as provided for by section 10207, Revised Statutes 1899, and, in addition to this, all of the parol testimony in the case almost conclusively shows that Conway did not start at any known or established line or corner in running the lines he testified he ran in testing the correctness of the position of this igneous rock. In other words, there is no credible evidence in this case which even remotely shows that Conway started from any legally constituted corner or line from which he made any of these surveys. All three of the surveys of these lots made by him vary from each other several feet, and from the lines of the other lots and blocks in the city, as well as from the street lines themselves.

We are, therefore, clearly of the opinion that the circuit court erred in admitting said surveys in evi-

dence as official records; and, consequently, the court should have sustained appellants' demurrer to the evidence.

Ordinarily, this conclusion would result in a reversal of the judgment without remanding the cause for a new trial; but since respondent has the right to rely upon private surveys supported by parol evidence, we think it best to reverse the judgment and remand the cause for a new trial, when the error before suggested may be avoided.

We do not wish to be understood as holding that both kinds of surveys, before mentioned, may not be admitted in evidence in the same case, but simply hold that one survey cannot be admitted upon both theories; and the court should, by proper instruction, tell the jury the legal effect of an official survey made under the authority of chapter 164, Revised Statutes 1899.

II.   Counsel for appellants also contend that the trial court should have sustained the demurrer to respondent's evidence, for the reason that she introduced no evidence of her ownership of the land in question.

The record shows that respondent, without objection, testified that she owned lots 4, 5, 8, 9 and 10 in block 4, and that she purchased them from Lorette Sisters about two years before the trial.

While it is true, ordinarily, the legal title to real estate cannot be proven by parol testimony, yet that is not universally so, especially where title is acquired by adverse possession, and in some other instances. But, however that may be, in a case of this character, where there was no question as to ownership raised at the trial, and where the contest was confined to the location of the boundary line between the litigants, it is too late for the defendants for the first time to raise the point in this court that the plaintiff did not show a legal paper title to the land in question. Such question should be considered as waived. [Sotebier v. Transit

Co., 203 Mo. 702; Davidson v. Transit Co., 211 Mo. 359.]

We are, therefore, of the opinion that this contention of appellants is untenable.

III. The action of the court in refusing to correct or reprimand counsel of respondent for improper remarks made to the jury regarding survey No. 77, made under the order of the trial court, is assigned as reversible error.

In our opinion that assignment is, theoretically, without merit, for the reason, as before stated, that if said survey made under the order of the circuit court was admissible at all in evidence, then it was entirely proper for counsel to refer to that fact in argument to the jury; but as that survey did not conform to the requirements of the statute. it should have been excluded from the jury, as well as all argument predicated upon it.

IV. The action of the trial court in excluding the following testimony offered by appellants is complained of as error. The questions and answers are inserted for the purpose of showing the full scope and purpose of the testimony offered:

"Q. You may state how that block is at present divided with reference to who has the greater portion of it between the fences as they now stand?

"By Mr. Jones: We object because it is incompetent, irrelevant and immaterial, and has no bearing on the issues in this case.

"By the Court: The objection is sustained.

"To the action of the court in sustaining the said objection defendants' counsel did then and there except and saves herein his exceptions.

"By Mr. McCullough: I think it is proper testimony.

"By the Court: I don't think it is.

"Q. You may state to this jury whether or not, how many lots are in this block? A. Ten. Q. How many on each side of the alley? A. Well, there is two of hers on one side and three of mine, and two of mine and three of hers on the other side. Q. You each own one-half of the block? A. Yes, sir. Q. Now state to this jury whether or not you at this time have more or less than one-half of the block.

"By Mr. Jones: We object because it is incompetent, irrelevant and immaterial and does not tend to prove or disprove any issue in the case.

"By the Court: The objection sustained.

"To the action of the court in sustaining the said objection defendants' counsel did then and there except and saves herein his exceptions.

"Q. Were the lots in that block all the same size? A. I can't tell you. I would suppose so. Q. You don't know whether they are the same size or not? A. No, sir; on the east side I don't. Q. What is the width of the lots on the east side? A. I have never measured on the east side. Q. You may state whether or not the fences between lots 7 and 8 divide that property and leaves two-fifths of the entire east half of that block south of the fence between lots 7 and 8 and three-fifths on the north side of that fence divides the property comprised in the east half of that block in that manner?

"By Mr. Jones: We object because they can't impeach a survey in that manner, and the evidence is incompetent, irrelevant and immaterial.

"By Mr. McCullough: We propose to show by this witness that this property as divided by the streets, alleys and fences as it has been so divided for thirty-five years, this block is divided equally between the parties.

"By the Court: I don't think you can impeach a survey this way. The objection is sustained.

"To the action of the court in sustaining the said objection defendants' counsel did then and there except and saves herein his exceptions.

"Q. You may state to this jury if you own more or less than one-half of that block as defined by the fences there now?

"By Mr. Dorian: We object because it is incompetent, irrelevant and immaterial. It is not the proper way to attack a survey.

"By the Court: The objection sustained.

"To this action of the court in sustaining the said objection defendants' counsel did then and there except and saves herein his exceptions.

"Q. You may state to this jury whether or not the survey as made for Miss Clark by Conway, whether or not it moved that whole block south about twelve feet and west about twenty or twenty-three feet? A. Yes, sir."

The foregoing questions were propounded to the witness Rufus McAtee, one of the defendants in the case, and substantially the same were propounded to some two or three other witnesses for defendants.

We are at a loss to know upon what theory of law this testimony was excluded from the jury. Both the respondent and appellants testified that block four, the one in which this land is located, is composed of ten lots, and that plaintiff owned five of them and the defendants owned the other five. And all the evidence shows that all of the lots are of the same size. That being true, it seems to us that it would have been entirely proper to show by their witnesses whether or not respondent at the time of the institution of the suit and at the date of the trial had her full one-half of said block four, and whether or not appellants had their full share thereof. If each party had his or her full share of the block, then it is perfectly clear that appellants were not in possession of nor were they withholding from respondent any portion of her said

lots. If, upon the other hand, appellants had in their possession more than one-half of the block of ground in question, then it would be equally clear that they have a portion of respondents' ground in their possession and were withholding it from her.

It seems to us that the easiest and most simple way to settle this controversy would be to take a tape line and measure all of the lots belonging to each party, and if the aggregate of each equaled the whole number of feet each was entitled to and also equaled one-half of the entire block, no less or no more, then it would seem unanswerable to say that each of them had all he or she was entitled to; but, if upon the other hand, such a measurement should show that appellants have ten or twelve feet more than their one-half of the block, as respondent claims they have, and that respondent has the same number of feet less than one-half thereof, then that would be very persuasive evidence that appellants had ten or twelve feet of respondent's ground.

There could be no better test than that if the full block of ground is there; and we judge from this record that there is no pretense but what it is there.

This evidence offered by appellants, and excluded by the court, should have been admitted; and, consequently, it was error to exclude it.

V. The correctness of instruction numbered one, given by the court on behalf of respondent, is assailed for the reason it leaves to the jury the right to pass upon and determine what evidence introduced was competent and what was incompetent.

That instruction, after predicating all of the facts necessary for the jury to find to be true in order to find for respondent, then wound up with this language: "And if the jury find from the greater weight of all the *competent* evidence in the cause that said allegations of plaintiff are correct, then their verdict must be for the plaintiff."

No impartial, unprejudiced person, it seems to us, can read this record without reaching the conclusion that the right and justice of this case, as presented by this record, is with the appellants; and we are at a loss to understand how a disinterested jury could have found against them without they disregarded all of their evidence introduced in the cause, which, clearly, they had the perfect right to do under the law as declared to them by this instruction. By this we do not mean to prejudge the merits of the case but simply to illustrate the effect of the error committed by giving said instruction.

The horn-books lay down the rule to be, that it is the province of the court and not that of the jury to determine the competency of evidence offered; and that when evidence is admitted, it is the duty of the jury to consider and weigh and give to it such credence as they may deem proper; but the jury has no right to decide upon the competency of testimony admitted by the court, as this instruction clearly authorized it to do.

We, therefore, hold that this instruction is erroneous, and should not have been given.

VI.    It is finally insisted by counsel for appellants that respondent's instruction numbered one, given by the court, is contradictory of and in conflict with instructions numbered one and three given for the appellants.

Respondent's said instruction in effect told the jury that if they believed from the evidence that survey No. 77, admitted in evidence, was correctly made, then they would find for the plaintiff; while instructions one and three given for appellants, in substance, told the jury that the question for them to determine was not how a correct survey would locate these lots, but how did the original survey locate them; and that the only purpose of the admission of survey No. 77 in

evidence was to assist the jury in locating the original boundaries of these lots; and not for the purpose of determining where they ought to have been located had the original town been accurately surveyed and platted.

There is a clear conflict between these instructions given on behalf of the respective parties. The one given for respondent told the jury to find for her, if they believed survey No. 77 was correctly made, regardless of the fact whether it corresponded with the original survey and plat of the town of Edina, while those given for appellants told the jury that said survey No. 77 was only evidence admitted for the purpose of establishing the boundaries of these lots as located by the original survey and plat of Edina. It may be, as some of the evidence tended to show, and especially the testimony of the surveyor, Conway, that the original town of Edina was not correctly surveyed. If that was true, then this instruction given for respondent required the jury to find for her in this case. That clearly is not the law. Respondent and appellants, and all other property-owners in that city for that matter, purchased their lots as established by the original survey and plat of Edina, and it was wholly immaterial whether Edina was originally surveyed and platted correctly or not.

Respondent purchased her lots according to that plat, and she sues for them by the description given in said plat, and she has no right to recover any ground not embraced within the boundaries of her lots as shown thereby, even though it should be concluded that the land she now sues for would have been embraced within her lots had the original town of Edina been correctly surveyed and platted. In other words, this instruction given for respondent authorizes the jury to give to her land not embraced within the boundaries of her lots, as shown by the original survey and plat of Edina, provided they further believe that said

survey and plat were not correctly made, and that survey No. 77 was correctly made. As before stated, that clearly is not the law, and respondent's instruction in that regard is erroneous, and is in direct conflict with those given for appellants, which correctly declared the law to the jury upon that subject.

We, therefore, reverse the judgment and remand the cause to the circuit court for a new trial. All concur.